1
2
3
4
5

Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse Swanhuyser (SBN 282186)
jesse@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, California 94129
Tel: (415) 360-2962

6
7
8
9
10
11

Nicole C. Sasaki (SBN 298736)
nicole@baykeeper.org
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Ste. 800
Oakland, California 94612
Tel: 510-735-9700
Fax: 510-735-9160

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

12
13

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

14
15
16
17
18
19
20
21
22
23

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a public benefit non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBAL PLATING, INC., a California corporation,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br><br>**Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387** |

Plaintiff San Francisco Baykeeper ("Baykeeper" or "Plaintiff"), by and through its counsel, alleges as follows:

## I.   **INTRODUCTION**

1.     This is a third-party enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "Act"), 33 U.S.C. § 1365(a)(1), to address violations of the Act by Defendant Global Plating, Inc. ("Global Plating" or "Defendant") arising out of Defendant's industrial metal plating operations at 44620 South Grimmer Boulevard in Fremont, California (94538) ("Facility").

2.     Since on or before May 7, 2016, Defendant has been discharging and continues to discharge polluted storm water from the Facility to Coyote Creek and South San Francisco Bay (hereinafter "Receiving Waters"), in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

3.     Since on or before May 7, 2016, Defendant has also violated the General Industrial Storm Water Permit issued by the State of California, NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ; as amended on November 6, 2018 ("General Permit").

4.     Defendant's ongoing and continuous failures to comply with the General Permit's technology-based and water quality-based standards, planning and monitoring requirements, and other procedural and substantive requirements create liability under the Act. 33 U.S.C. §§ 1342, 1365.

5.     The Clean Water Act is a strict liability statute. Defendant's failure to properly enroll in the General Permit, as well as each violation of any term or condition in the General Permit, are independent violations of the Act. 33 U.S.C. §§ 1342, 1365.

6.     Global Plating is liable for ongoing and continuous violations of the Act and General Permit at the Facility since May 7, 2016. 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

7.     Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Act and General Permit.

## II.    **JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over Plaintiff and Defendant (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).

9.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

10.    Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to enforcing the Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing sufficient information to allow the

recipient to identify the standard, limitation or order alleged to be violated, and the activity alleged to constitute a violation. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

11.     The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act, and where the alleged violator is a corporation, to the corporation's registered agent for service of process by first class mail. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

12.     A copy of the Notice Letter must be mailed to the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

13.     On May 7, 2021, Plaintiff sent a Notice Letter describing ongoing violations of the Act and General Permit at the Facility, and provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the Notice Period.

14.     The Notice Letter was sent by certified mail to: (a) Douglas Brother, CEO and Agent for Service of Process (certified mail no. 7020 1290 0000 2043 3841); (b) Bobbi Burns, the Facility's General Manager (certified mail no. 7020 1290 0000 2043 3858); (c) Michael Regan, Administrator of the U.S. EPA (certified mail no. 7020 1290 0000 2043 3865); (d) Merrick Garland, U.S. Attorney General/U.S. Department of Justice (certified mail no. 7020 1290 0000 2043 4466); (d) Eileen

Sobeck, Executive Director at State Water Resources Control Board (certified mail no. 7020 1290 0000 2043 4480); (e) Deborah Jordan, Acting Regional Administrator at the U.S. EPA Region IX office (certified mail no. 7020 1290 0000 2043 3834); and (f) Michael Montgomery, Executive Director at the San Francisco Bay Regional Water Quality Control Board (certified mail no. 7020 1290 0000 2043 3827).

15.     More than sixty (60) days have passed since the Notice Letter was served on Global Plating, and the State and Federal agencies.

16.     Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this complaint.

17.     This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

18.     Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## III.    INTRADISTRICT ASSIGNMENT

19.     Intradistrict assignment of this matter to the San Francisco or Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(d).  The events or omissions which give rise to Baykeeper's claims occurred in Alameda County, which is under the jurisdiction of the San Francisco or Oakland Division of the Northern District of California.

/ / /

/ / /

IV.   **THE PARTIES**

   A.   San Francisco Baykeeper

20.   Baykeeper is a non-profit public benefit corporation organized under the laws of California with its main office at 1736 Franklin Street, Suite 800 in Oakland, California (94612).

21.   Baykeeper's mission is to defend San Francisco Bay from the biggest threats, and hold polluters accountable to create healthier communities and help wildlife thrive.

22.   Baykeeper is dedicated to protecting the water quality of San Francisco Bay for the benefit of its ecosystems and communities.

23.   To further these goals, Baykeeper actively seeks federal and state agency implementation of the Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members

24.   Baykeeper has approximately 3,500 members who use and enjoy San Francisco Bay and connected surface waters for various recreational, educational, and spiritual purposes.

25.   Baykeeper has members who reside in Alameda County, and near the Receiving Waters.

26.   The Facility's unlawful discharge of pollutants into the Receiving Waters impairs the interests of Baykeeper's members who use and enjoy the Receiving Waters by degrading water quality, and by posing risks to human health and aquatic life.

27.    The interests of Baykeeper and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

28.    Baykeeper brings this action on behalf of its members, many of whom regularly enjoy San Francisco Bay and/or seek to protect its waters and the wildlife inhabiting San Francisco Bay and adjacent areas.

29.    Defendant's continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

30.    Neither the claims brought by Plaintiff nor the relief Plaintiff requests requires the participation of individual members.

31.    The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

B.    <u>Global Plating, Inc.</u>

32.    Global Plating first filed articles of incorporation with California's Secretary of State on July 10, 1981.

33.    Douglas Brothers is the Facility owner.

34.    Bobbi Burns is the Facility operator.

35.    The Facility is an electroplating operation.

36.    Global Plating is engaged in manufacturing activity classified under Standard Industrial Classification ("SIC") code 3471 (Electroplating, Plating, Polishing, Anodizing, and Coloring).

37.     Global Plating's primary services are cleaning, polishing, anodizing and electroplating metal parts.

38.     The Facility conducts, among others, the following industrial activities: masking, barrel plating, electropolishing, bright nickel electroplating, copper electroplating, chrome electroplating, chemical stripping, chemical cleaning, and passivation.

39.     Pollutant sources at the Facility include all industrial activities that take place wholly or partially outdoors (e.g., operating industrial machinery, shipping/receiving industrial products), as well as the emission of particulate matter resulting from industrial processes.

40.     Industrial pollutants with the potential to impact the quality of storm water discharged from the Facility include, but are not limited to, agents affecting pH, total suspended solids, specific conductance-altering agents, total organic carbon, aluminum, chromium, copper, nickel, silver, and zinc.

## V.     **REGULATORY BACKGROUND**

### A.     **The Problem of Storm Water Pollution**

41.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into the San Francisco Bay Area's storm drains, local waterways, wetlands and estuaries, San Francisco Bay, and the Pacific Ocean.

42.     The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks, rivers, and coastal waters each year.

43.     The San Francisco Bay and connected surface waters are ecologically sensitive areas, and are essential habitat for numerous cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

44.     The San Francisco Bay and connected surface waters provide numerous recreational activities, including swimming, fishing, surfing, SCUBA diving, and kayaking.

45.     The San Francisco Bay and connected surface waters also provide non-contact recreational and aesthetic opportunities, such as biking and wildlife observation, as well as opportunities for education and research.

46.     Industrial facilities, like Defendant's, that discharge storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits San Francisco Bay Area waters have for locals and visitors alike.

47.     Controlling polluted storm water and non-storm water discharges is essential to protecting northern California's surface and coastal waters.

48.     As the Act requires, discharges of contaminated storm water can and must be controlled for local ecosystems to regain their health, and to protect public health.

**B.     The Clean Water Act**

49.     The Act is the primary Federal statute protecting surface waters in the United States.

50.     The Act aims to prevent, reduce, and eliminate pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

51.     In order to accomplish that goal, Section 301(a), 33 U.S.C. § 1311, prohibits the discharge of any pollutant into waters of the United States unless the discharger complies with other enumerated sections of the Act, including the prohibition on discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See also* 40 C.F.R. § 122.26(c)(1) and General Permit, § I.A.12.

52.     The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

53.     Section 402(p) of the Act establishes the framework regulating industrial storm water discharges under federal, and authorized state, NPDES permit programs. 33 U.S.C. § 1342(p).

54.     Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. 33 U.S.C. § 1342(b).

55.     States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers, and/or through individual NPDES permits issued to specific dischargers. *See Id.*

56.     Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

57.     A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. 33 U.S.C. § 1362(5).

58.     "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; and (b) any condition of an NPDES permit such as the General Permit. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).").

59.     Pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate statutory violation subjects the violator to penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after December 23, 2020.

60.     Section 505(d) of the Act allows a prevailing or substantially prevailing party to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

/ / /

/ / /

1

**C.     General Permit Enrollment and Compliance**

2      61.     The State Water Resources Control Board ("State Board") is charged

3  with regulating pollutants to protect California's water resources. *See* Cal. Water

4  Code § 13001.

5      62.     California is authorized by U.S. EPA to issue NPDES permits for storm

6  water discharges associated with industrial activities.

7      63.     The relevant NPDES permit in this action is the General Permit, which is

8  issued by the State Board, and is implemented and enforced by Regional Water

9  Quality Control Boards, including the San Francisco Bay Regional Water Quality

10  Control Board ("Regional Board"). *See* 33 U.S.C. §§ 1311(a), 1342, 1362(6), 1362(7),

11  1362(12).

12      64.     In order to lawfully discharge pollutants to waters of the United States in

13  California, all persons who discharge storm water associated with industrial activity

14  must enroll in, and comply with all applicable terms and conditions of, the General

15  Permit. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

16      65.     SIC Code 3471 facilities must enroll in and obtain coverage under the

17  General Permit in order to lawfully discharge storm water to waters of the United

18  States. *See* General Permit, Attachment A, ¶ 2.

19      66.     The General Permit provides for at least two types of enrollment status—

20  "NOI status" and "NEC status."

21      67.     To secure "NOI status," a discharger must file a Notice of Intent to

22  Comply ("NOI") with the State Board prior to discharge.

23

68. The NOI serves as certification to the State of California that the industrial facility owner(s) and agent(s) have read the General Permit and will comply with all applicable terms and conditions. *See* 40 C.F.R. § 122.26(A)(1)(ii); General Permit, § I.A.12.

69. Generally, the General Permit requires permittees with NOI status to consistently engage in four independent, but mutual-reinforcing actions: 1) executive planning and facility-specific pollution control design; 2) on-the-ground implementation of pollution control technologies; 3) monitoring storm water discharges for evidence of pollution; and 4) annual evaluation of the effectiveness of pollution control strategies, including corrective action where necessary. Collectively, these steps constitute an iterative, self-evaluation process.

70. Specifically, facilities with NOI coverage are required to comply with each of the requirements contained in the General Permit described below at sections C (Effluent Limitations), D (Receiving Water Limitations), E (Storm Water Pollution Prevention Plan requirements) and F (Monitoring and Reporting requirements).

71. As an alternative to enrolling in the General Permit under NOI status, owners/operators can file for no exposure certification, "NEC status."

72. To obtain NEC status, owners/operators certify (and re-certify annually) that there is no exposure of industrial activities to storm water at their facility. General Permit § XVII.A.1.

73. Facilities with NEC status nominally participate in the General Permit program, but are not required to demonstrate compliance with technology-based

pollution controls or water quality-based pollution limits; or engage in the iterative permit compliance process described in paragraph 69.

74.     NEC enrollment is intended to reduce the regulatory burden on the small subset of facilities where industrial activities are entirely indoors, and the only items exposed to precipitation are roofs, parking lots, vegetated areas, and other non-industrial areas or activities, i.e., the facility poses "very low risk or [] no risk [of] storm water contamination." 64 Fed. Reg. 68782 (Dec. 8, 1999).

75.     Compliance with the General Permit constitutes compliance with the Act for purposes of storm water discharges. 33 U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit, § XXI.A.

76.     Discharges of storm water containing pollutants to waters of the United States, therefore, are violations of the Act where they are: (a) unpermitted; or (b) completed without complying with applicable terms and conditions of a valid NPDES permit. *See* General Permit, § I.8 ("This General Permit authorizes discharges of industrial storm water to waters of the United States, so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.")

**D.     The General Permit's Technology-Based Standards (a.k.a. Effluent Limitations)**

77.     The Act and General Permit require dischargers with NOI status to comply with statutorily established technology-based standards. 33 U.S.C. § 1311(b); General Permit, § V.

78.     The General Permit incorporates statutorily defined technology-based pollution standards as "Effluent Limitations."

79.     The General Permit's technology-based Effluent Limitations set the floor for pollution reduction, i.e., the minimum level of pollution reductions, which must be achieved by all permittees regardless of the quality of water receiving storm water discharges.

80.     The General Permit's technology-based Effluent Limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants, and Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants (collectively "BAT/BCT"). 40 C.F.R. §§ 401.15-401.16; General Permit, § V.A.

81.     Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, total suspended solids ("TSS"), oil and grease ("O&G"), and pH, among others.

82.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include, among others, chromium, copper, nickel, and zinc.

83.     Compliance with the BAT/BCT standard requires permittee facilities to design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges in a manner that reflects best industry practice. General Permit, § V.A.

84.     BMPs are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of

waters of the United States. BMPs include treatment systems, operation procedures, and practices to control and abate the discharge of pollutants from the Facility. *See id*.

85.     Permittees must design BMPs that meet the BAT/BCT standard for all sources of toxic pollutants; and thereafter implement and maintain, as well as evaluate and improve, such BMPs to ensure pollutant concentrations in any storm water discharge are controlled consistent with the BAT/BCT standard. *See id*.

86.     The 2015 and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric benchmark standards for pollutant concentrations in storm water discharges ("EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective June 4, 2015, reissued and modified effective March 1, 2021 ("Multi-Sector General Permit").

87.     EPA Benchmarks are objective numeric targets for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standard. *Santa Monica Baykeeper v. Kramer Metals, Inc.* ("*Kramer*"), 619 F. Supp. 2nd 914, 921 (C.D. Cal. 2009); *see also* 86 Fed. Reg. 10269 (Feb. 19, 2021); 80 Fed. Reg. 34403 (June 16, 2015); 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

88.     The General Permit's Numeric Action Levels ("NALs"), which are derived from EPA Benchmark values published in the 2008 Multi-Sector General Permit, are objective numeric standards relevant to evaluating whether BMPs designed and implemented at a facility achieve the statutory BAT/BCT standard.

89.     The discharge of storm water containing pollutant concentrations exceeding EPA Benchmark targets and/or NALs evidence a failure to develop and implement pollution control strategies that achieve pollutant reductions consistent with the BAT/BCT standard. *Kramer*, 619 F. Supp. 2nd at 921-25; *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

90.     TABLE 1 and TABLE 2 contain EPA Benchmark standards relevant to assessing the Facility's compliance with the BAT/BCT standard.

**TABLE 1**
2015 U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| Pollutant | Freshwater Benchmark | Saltwater Benchmark |
|---|---|---|
| aluminum | 0.75 mg/L* | 0.75 mg/L |
| copper | 0.0332 mg/L | 0.0048 mg/L |
| iron | 1.0 mg/L | 1.0 mg/L |
| zinc | 0.26 mg/L | 0.09 mg/L |

* mg/L = milligrams per liter

**TABLE 2**
2021 U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| Pollutant | Freshwater Benchmark | Saltwater Benchmark |
|---|---|---|
| aluminum | 1.1 mg/L | 1.1 mg/L |
| copper | 0.00519 mg/L | 0.0048 mg/L |
| nickel | 0.47 mg/L | 0.074 mg/L |
| zinc | 0.120 mg/L | 0.09 mg/L |

91.     TABLE 3 contains NALs relevant to assessing the Facility's compliance with the BAT/BCT standards.

**TABLE 3**
NALs APPLICABLE TO THE FACILITY'S DISCHARGES

| Pollutant | NAL |
|---|---|
| aluminum | 0.75 mg/L |
| copper | 0.0332 mg/L |
| iron | 1.0 mg/L |
| zinc | 0.26 mg/L |

92.     Facility owners/operators must perform visual observations (and maintain records) pursuant to the General Permit, which are relevant to assessing a permittee's compliance with the BAT/BCT standards.

93.     Objective assessments of whether BMPs described in a SWPPP and/or implemented at a facility are consistent with industry best practices are relevant to assessing a permittee's compliance with the BAT/BCT standards.

**E.     The General Permit's Receiving Water Limitations**

94.     In addition to the technology-based Effluent Limitations, the General Permit requires that permittees with NOI status meet "any more stringent [water quality-based limitations] necessary for receiving waters to meet applicable water quality standards." General Permit, § I.D.31.

95.     The General Permit contains water quality-based standards titled Receiving Water Limitations.

96.     The General Permit's first Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard. General Permit, § VI.A.

97.     The General Permit's second Receiving Water Limitation prohibits discharges that adversely affect human health or the environment. General Permit, § VI.B.

98.     The General Permit's third Receiving Water Limitation prohibits discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance. General Permit, § VI.C.

99.     Receiving Water Limitations are typically more stringent than the technology-based standards where a facility's receiving waters are impaired by one or more pollutant. 33 U.S.C. § 1311(b)(1)(C).

100.    The General Permit's Receiving Water Limitations are intended to protect the beneficial uses of surface waters to which a facility's storm water is discharged. General Permit, § VI.A.

101.    The San Francisco Bay Basin (Region 2) Water Quality Control Plan ("Basin Plan") designates Beneficial Uses for the Receiving Waters—Coyote Creek and South San Francisco Bay.

102.    The Basin Plan identifies potential and existing Beneficial Uses of the Receiving Waters, which include, but are not limited to: commercial and sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered species, water contact and non-contact recreation, shellfish harvesting, fish spawning, and wildlife habitat.

103.    The Receiving Waters are important community resources. Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters continue to serve vital social, environmental, and economic functions.

104.    Coyote Creek is the predominant drainage in the eastern portions of San Jose and Fremont, and is an important ecological resource in the South Bay.

105.    Historically, Coyote Creek supported numerous fish populations, including steelhead, Coho salmon, and Chinook salmon.

106.   Steelhead and Chinook salmon still use Coyote Creek for spawning and early development life stages.

107.   Coyote Creek is also important habitat for numerous aquatic and riparian plants and animals in the region.

108.   From Coyote Creek, storm water and comingled pollutants from the Facility enter South San Francisco Bay

109.   According to the Basin Plan, "South San Francisco Bay south of the Dumbarton Bridge is a unique, water-quality-limited, hydrodynamic and biological environment that merits continued special attention by the Water Board. Controlling urban and upland runoff sources is critical to the success of maintaining water quality in this portion of the Bay."

110.   Water quality standards applicable to the Facility are established in, among others, Basin Plan, Tables 3-3, 3-3A, and 3-4 and the California Toxics Rule ("CTR"), 40 C.F.R § 131.38.

111.   Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. *See* Basin Plan, Chapters 2 (beneficial uses) and 3 (water quality objectives).

112.   By Resolution R2-2007-0042, the Regional Board amended the Basin Plan to incorporate and adopt site-specific objectives for copper in San Francisco Bay.

113.   Except for where site-specific objectives have been adopted, numeric water quality objectives applicable to the Receiving Waters are those contained in the California Toxics Rule, which are incorporated into and enforceable through the Basin Plan. *See e.g.*, Basin Plan, Table 3-3 notes a and b; Table 3-4 notes a and b.

114.   Storm water discharges with pollutant concentrations that exceed levels contained in applicable water quality standards are violations of the General Permit and the Act. *Kramer*, 619 F. Supp. 2nd at 926–27; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999) (industrial storm water discharges must strictly comply with water quality standards).

115.   Water quality standards applicable to storm water discharges from the Facility are detailed in TABLE 4.

**TABLE 4**
WATER QUALITY STANDARDS APPLICABLE TO GLOBAL PLATING FACILITY

| Pollutant | Basin Plan/CTR (Freshwater CMC) | Basin Plan/CTR (Saltwater CMC) |
|---|---|---|
| chromiumVI | 0.016 mg/L | 1.1 mg/L |
| copper | 0.013 mg/L | 0.0108 mg/L |
| zinc | 0.12 mg/L | 0.09 mg/L |
| nickel | 0.47 mg/L | 0.0624 mg/L |

## F.   The General Permit's Pollution Prevention Plan Requirements

116.   The General Permit requires the preparation and implementation of a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to lawfully continue, industrial activities for all facilities with NOI status. General Permit, §§ I.I.54, X.B.

117.   To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015 or upon commencement of industrial activity. *See* General Permit, § X.B.

118.   The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) describe and detail site-specific BMPs to reduce or prevent pollutant concentrations in discharges to levels that comply with the General Permit's

technology-based Effluent Limitations and Receiving Water Limitations. General Permit, § X.C.

119.   The SWPPP must include, among other requirements: i) a narrative description and summary of all industrial activities, potential sources of pollution, and pollutants associated with each potential source; ii) the identification and location where materials are being shipped, received, stored, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; iii) a description of dust and particulate generating activities; iv) a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollution control measures (i.e., BMPs); v) a description of storm water management practices; vi) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; vii) the identification of unauthorized non-stormwater discharges and a description of how all such discharges have been eliminated; and viii) a description of persons and their current responsibility for developing and implementing the SWPPP. General Permit, § X.A–I.

120.   The most important elements of any SWPPP are the description of each industrial process occurring at a facility, and the assessment of potential pollutant sources ("Source Evaluation and Pollutant Assessment"). *See* General Permit, §§ X.C, X.F, X.G.

121.   Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed for their potential contribution of pollutants in storm water discharges in the SWPPP's Source Evaluation and Pollutant Assessment.

122.   The SWPPP must be evaluated and revised at least annually to ensure ongoing compliance. General Permit, § X.B.

123.   Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the General Permit, and creates liability under the Act. General Permit, § X.B; *see also* General Permit, Fact Sheet § II.I.1.

**G.     The General Permit's Compliance Evaluation Requirements**

124.   The General Permit requires permittees to complete an Annual Comprehensive Site Compliance Evaluation ("Compliance Evaluation"). General Permit, § XV.

125.   The goal of the Compliance Evaluation is to ensure and certify compliance with all other substantive and procedural mandates contained in the General Permit.

126.   The Compliance Evaluation must include: a review of all sampling, visual observation, and inspection records conducted during the previous year; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; an inspection of all drainage areas previously identified as having no exposure to industrial activities; an inspection of equipment needed to implement BMPs; an evaluation of each BMP to determine whether it is

23

objectively adequate in light of monitoring and reporting plan data; an assessment of BMP design and implementation effectiveness; a determination of whether additional BMPs are needed to comply with the General Permit; and an assessment of any other factors needed to comply with the requirements of Section XVI.B (i.e. Annual Report mandates). General Permit, § XV.

### H.    The General Permit's Monitoring and Reporting Requirements

127.    The General Permit requires that permittees with NOI status develop a written plan containing the permittee facility's monitoring and reporting program ("Monitoring Implementation Plan" or "MIP") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ X.I.1-5, XI.

128.    The objectives of the MIP are to detect and measure the concentration of pollutants in a facility's storm water discharges, and to ensure compliance with the General Permit's substantive mandates, including the technology-based BAT/BCT standard and any more stringent Receiving Water Limitations. *See* General Permit, Fact Sheet § II.J.1.

129.    A lawful MIP ensures that BMPs are effectively reducing and/or eliminating pollutants in a facility's storm water discharges, and is evaluated and revised whenever appropriate to ensure ongoing compliance with the General Permit. *Id.*

130.    Information derived from the MIP informs each permittee as to whether it must adapt BMP design or implementation to ensure that storm water and non-storm water discharges comply with the General Permit's technology-based Effluent

Limitations and water quality-based Receiving Water Limitations. General Permit, §§ X.I, XI.

131.   The MIP is an essential component in the General Permit's mandatory iterative self-evaluation process (described at paragraph 69) whereby permittees must implement BMPs contained in the SWPPP, evaluate BMP effectiveness using visual observation and storm water sampling data, and then revise BMPs as necessary to consistently comply with the General Permit's technology-based Effluent Limitations and water quality-based Receiving Water Limitations.

132.   The MIP must include monthly visual observations of storm water discharges, as well as storm water sampling from each location where storm water is discharged from a facility. General Permit, § XI.A.

133.   Visual observations must document the presence of any floating and suspended material, oil and/or grease (e.g., sheen), discolorations, turbidity, odor and identify the source of any pollutants. General Permit, § XI.A.2.

134.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants from coming into contact with storm water and discharging to waters of the United States. General Permit, § XI.A.3.

135.   The General Permit requires permittees to collect samples of storm water from each location where storm water is discharged from its facility. General Permit, § XI.B.4.

136.   The General Permit requires permittees to collect and analyze storm water samples from two Qualifying Storm Events within the first half of each

Reporting Year (July 1 to December 31), and two Qualifying Storm Events within the second half of each Reporting Year (January 1 to June 30). General Permit, § XI.B.2.

137.   A Qualifying Storm Event is a precipitation event that: a) produces a discharge for at least one drainage area; and b) is preceded by 48 hours with no discharge from any drainage area. General Permit, § XI.B.1

138.   The General Permit requires permittees to submit all sampling and analytical results for every sample via the State Board's online NPDES reporting database system—Stormwater Multiple Application and Report Tracking System ("SMARTS")—within thirty (30) days of obtaining each analytical report from a certified laboratory. General Permit, § XI.B.11.a.

139.   Permittees must analyze each sample for as many as five sets of pollutants, including: 1) conventional pollutants (pH, TSS, and either total organic carbon or oil and grease), General Permit, §§ XI.B.6.a-b; 2) facility-specific pollutants identified in the Source Evaluation and Pollutant Assessment, e.g. chromium, copper and nickel, General Permit, § XI.B.6.c; 3) pollutants for which the Receiving Waters are impaired, General Permit, § XI.B.6.e; 4) Standard Industrial Classification code-based parameters listed in the General Permit at Table 1, which are pollutants common to discharges from particular types of industrial activities, General Permit, § XI.B.6.d; and 5) Regional Board-mandated parameters, which are any additional pollutants identified by the Regional Board, General Permit, § XI.B.6.f.

140.   The General Permit requires permittees submit an Annual Report to the relevant Regional Board by July 1 of each year, which must include, among other items, all records collected in the MIP and the Compliance Evaluation.

141.   The General Permit requires permittees submit a Compliance Checklist with each Annual Report that contains the following: 1) an indication of whether the permittee complies with, and has addressed all applicable requirements of, the General Permit; 2) an explanation for any noncompliance with requirements within the reporting year, as indicated in the Compliance Checklist; and 3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and 4) the date(s) of the annual Compliance Evaluation. General Permit, § XVI.

142.   Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by: 1) a fine of not more than $10,000; 2) imprisonment for not more than two years; or 3) both.

143.   Permittees that fail to develop and implement an adequate MIP that includes both visual observations, and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

**I.      The General Permit's Non-Exposure Certification Program**

144.   As described above at paragraphs 71 through 74, facilities that can certify that storm water is not exposed to any industrial pollutant source may enroll in the General Permit using "NEC" status, which relieves such facility from complying with a majority of the General Permit's mandates.

145.   The use of outdoor spaces for any industrial activity, including the operation of industrial machinery (e.g., forklifts) or storage of industrial materials (e.g., shipping/receiving inputs or final products), are conditions that preclude the lawful enrollment in the NEC program. General Permit §§ XVII.A.1, B.2-3.

146.   Facilities emitting particulate pollution through stacks or vents are also ineligible for NEC coverage. 2015 Permit, Appendix 2, § B.5.a ("[d]eposits of particles or residuals from roof stacks/vents that have the potential to be mobilized by storm water runoff are considered exposed."); *see also* Discharger's Guide to SMARTS No Exposure Certification (May 24, 2018); *see also* 1997 Permit, page iv ("Facility operators … are not subject to this General Permit if they can certify that … [t]here is no exposure of materials associated with industrial activity through [] direct or indirect pathways such as particulates from stacks and exhaust systems").

## VI.   STATEMENT OF FACTS

147.   Global Plating is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

148.   Global Plating owns and operates the Facility located at 44620 South Grimmer Boulevard in Fremont, California (94538).

149.   The Facility discharges storm water associated with industrial activity.

150.   Aluminum, barium, chromium, cobalt, copper, iron, lead, nickel, vanadium, and zinc are present in storm water discharged from the Facility.

151.   The presence of aluminum, barium, chromium, cobalt, copper, iron, lead, nickel, vanadium, and zinc is confirmed by samples of storm water collected at the Facility by Baykeeper on January 28, 2021.

152.   These pollutants were present in the January 28, 2021 samples in the following concentrations from three separate discharge locations: aluminum (5.6 mg/L, 22 mg/L, 0.73 mg/L), barium (0.19 mg/L, 0.19 mg/L, 0.014 mg/L), chromium (0.027 mg/L, 0.065 mg/L, 0.012 mg/L), cobalt (0.0063 mg/L, 0.017 mg/L, non-detect), copper (0.16 mg/L, 0.077 mg/L, 0.034 mg/L), iron (8.2 mg/L, 30 mg/L, 0.92 mg/L), lead (0.025 mg/L, 0.066 mg/L, non-detect), nickel (0.11 mg/L, 0.11 mg/L, 0.062 mg/L), vanadium (0.017 mg/L, 0.065 mg/L, non-detect), and zinc (0.71 mg/L, 0.57 mg/L, 0.19 mg/L).

153.   Aluminum, barium, chromium, cobalt, copper, iron, lead, nickel, vanadium, and zinc are pollutants under the Act. *See* 33 U.S.C. § 1362(6); *see also* 40 C.F.R. § 122.2.

154.   A section of Coyote Creek is situated approximately 550 feet west of the Facility.

155.   There are at least five municipal separate storm sewer system ("MS4") inlets in the vicinity of the Facility—three located in the parking lot shared by Global Plating and its neighbor(s) at 44650 South Grimmer Boulevard, and two located on South Grimmer Boulevard within 200 feet of the Facility.

156.   Each of the MS4 inlets in the vicinity of the Facility discharge storm water to Coyote Creek.

157.   Coyote Creek is a water of the United States.

158.   Coyote Creek empties into South San Francisco Bay approximately one mile from the Facility.

159.   South San Francisco Bay is a water of the United States.

160.   The Facility is engaged in the electroplating business and is classified as a SIC Code 3471 facility.

161.   SIC Code 3471 facilities must enroll in and obtain coverage under the General Permit in order to lawfully discharge storm water to waters of the United States. *See* General Permit, Attachment A.

162.   Global Plating enrolled the Facility in the General Permit with NOI status prior to 2008 under waste discharger identification number 2 01I006142.

163.   On or about June 6, 2008, the Regional Board approved a Notice of Termination for waste discharger identification number 2 01I006142.

164.   The Facility re-enrolled in the General Permit on July 2, 2015.

165.   In its July 2, 2015 enrollment, Global Plating certified under penalty of law that the facility met all requirement to receive NEC status.

166.   Based on its certification, the Facility was permitted with NEC status and assigned NEC identification number 2 01NEC000038.

167.   Global Plating has re-certified its NEC status each year since 2015—including on or about September 8, 2016, August 31, 2017, July 11, 2018, July 19, 2019 and September 9, 2020.

168.   Each certification described in paragraph 167 contains false information.

169.   The Facility has been operating since 2015 with improperly obtained and unlawful NEC status.

170.   The Facility conducts some industrial activity outdoors.

171.   Global Plating uses, stores, and ships/receives industrial materials (e.g., chemical inputs, coated products, waste) and industrial equipment (e.g., forklifts, processing racks) in the outdoor portions of the Facility.

172.   The use of outdoor spaces for any industrial activity, including the operation of industrial machinery (e.g., forklifts) or storage of industrial materials (e.g., shipping/receiving inputs or final products), are conditions that preclude the lawful enrollment in the General Permit under NEC status.

173.   Some of the Facility's indoor industrial activities generate particulate air emissions.

174.   The Facility has sources of particulate air emissions regulated by the Bay Area Air Quality Management District.

175.   Some of the Facility's emissions sources emit particulate matter to the atmosphere through stacks, vents and/or exhaust equipment.

176.   For example, a hexavalent chromium plating tank identified as Source 6 vents to roof-mounted stack P-2.

177.   Pollutants that are potentially emitted to the atmosphere as a result of industrial activities undertaken at the Facility include, but are not limited to, zinc, nickel, chromium, and silver.

178.   During rain events, emitted metal particulate is exposed to and pollutes with storm water prior to being discharged from the Facility to the Receiving Waters.

179.   The General Permit states that "[d]eposits of particles or residuals from roof stacks/vents that have the potential to be mobilized by storm water runoff are considered exposed." 2015 Permit, Appendix 2, § B.5.a; *see also* Discharger's Guide

to SMARTS No Exposure Certification (May 24, 2018); *see also* 1997 Permit, page iv

("Facility operators … are not subject to this General Permit if they can certify that …

[t]here is no exposure of materials associated with industrial activity through [] direct

or indirect pathways such as particulates from stacks and exhaust systems").

180.   The Facility's emissions of metal particulate that are exposed to and

comingle with storm water prior to being discharged to the Receiving Waters are a

condition that precludes the lawful enrollment in the NEC program.

181.   Global Plating has not implemented BMPs that comply with the

BAT/BCT standard in violation of the Act and General Permit.

182.   Data from storm water samples collected at the Facility on January 28,

2021 establish that the concentrations of aluminum, iron, copper, nickel, and zinc

exceeded the EPA Benchmark standards for those pollutants (see TABLE 5-A and

TABLE 5-B).

**TABLE 5-A**
SUMMARY OF 1/28/2021 STORM WATER SAMPLE
ANALYSIS COMPARED TO 2015 BENCHMARKS

| Pollutant (Discharge Point) | Result | Benchmark (Freshwater) | % Exceedance | Benchmark (Saltwater) | % Exceedance |
|---|---|---|---|---|---|
| aluminum (Shared Parking Lot) | 5.6 mg/L | 0.75 mg/L | 746.6% | 0.75 mg/L | 746.6% |
| copper (Shared Parking Lot) | 0.16 mg/L | 0.0332 mg/L | 481.9% | 0.0048 mg/L | 3333.3% |
| iron (Shared Parking Lot) | 8.2 mg/L | 1.0 mg/L | 820% | 1.0 mg/L | 820% |
| zinc (Shared Parking Lot) | 0.71 mg/L | 0.26 mg/L | 273.1% | 0.09 mg/L | 788.9% |
| aluminum (Facility West) | 22 mg/L | 0.75 mg/L | 2933.3% | 0.75 mg/L | 2933.3% |
| copper (Facility West) | 0.077 mg/L | 0.0332 mg/L | 231.9% | 0.0048 mg/L | 160.4% |
| iron (Facility West) | 30 mg/L | 1.0 mg/L | 3000% | 1.0 mg/L | 3000% |
| zinc (Facility West) | 0.57 mg/L | 0.26 mg/L | 219.2% | 0.09 mg/L | 633.3% |
| copper (Storm Drain Parking Lot) | 0.034 mg/L | 0.0332 mg/L | 102.4% | 0.0048 mg/L | 708.3% |
| zinc | 0.19 | 0.26 | x | 0.09 | 211.1% |

| (Storm Drain Parking Lot) | mg/L | mg/L | | mg/L | |

**TABLE 5-B**

SUMMARY OF 1/28/2021 STORM WATER SAMPLE

ANALYSIS COMPARED TO 2021 BENCHMARKS

| Pollutant (Discharge Point) | Result | Benchmark (Freshwater) | % Exceedance | Benchmark (Saltwater) | % Exceedance |
|---|---|---|---|---|---|
| aluminum (Shared Parking Lot) | 5.6 mg/L | 1.1 mg/L | 509.1% | 1.1 mg/L | 509.1% |
| copper (Shared Parking Lot) | 0.16 mg/L | 0.00519 mg/L | 3082.8% | 0.0048 mg/L | 3333.3% |
| nickel (Shared Parking Lot) | 0.11 mg/L | 0.470 mg/L | x | 0.074 mg/L | 148.6% |
| zinc (Shared Parking Lot) | 0.71 mg/L | 0.120 mg/L | 591.7% | 0.09 mg/L | 788.9% |
| aluminum (Facility West) | 22 mg/L | 1.1 mg/L | 2000% | 1.1 mg/L | 2000% |
| copper (Facility West) | 0.077 mg/L | 0.00519 mg/L | 1483.6% | 0.0048 mg/L | 1604.2% |
| nickel (Facility West) | 0.11 mg/L | 0.470 mg/L | x | 0.074 mg/L | 148.6% |
| zinc (Facility West) | 0.57 mg/L | 0.120 mg/L | 475% | 0.09 mg/L | 633.3% |
| copper (Storm Drain Parking Lot) | 0.034 mg/L | 0.00519 mg/L | 655.1% | 0.0048 mg/L | 708.3% |
| zinc (Storm Drain Parking Lot) | 0.19 mg/L | 0.120 mg/L | 158.3% | 0.09 mg/L | 211.1% |

183.    Exceedances of EPA Benchmarks evidence Global Plating's failure to identify, develop and/or implement effective site specific BMPs to reduce or prevent the discharge of contaminated storm water from the Facility as required to comply with the General Permit's Effluent Limitations (i.e., the BAT/BCT standard).

184.    Data from storm water samples collected at the Facility on January 28, 2021 establish that the concentrations of aluminum, iron, copper, and zinc exceeded the General Permit's NALs for those pollutants (see TABLE 6).

**TABLE 6**

SUMMARY OF 1/28/2021 STORM WATER SAMPLE

ANALYSIS COMPARED TO NUMERIC ACTION LEVELS

| Pollutant (Discharge Point) | Result | Numeric Action Level | % Exceedance |
|---|---|---|---|
| aluminum (Shared Parking Lot) | 5.6 mg/L | 0.75 mg/L | 746.6% |

| | | | |
|---|---|---|---|
| copper<br>(Shared Parking Lot) | 0.16<br>mg/L | 0.0332<br>mg/L | 481.9% |
| iron<br>(Shared Parking Lot) | 8.2<br>mg/L | 1.0<br>mg/L | 820% |
| zinc<br>(Shared Parking Lot) | 0.71<br>mg/L | 0.23<br>mg/L | 308.7% |
| aluminum<br>(Facility West) | 22<br>mg/L | 0.75<br>mg/L | 2933.3% |
| copper<br>(Facility West) | 0.077<br>mg/L | 0.0332<br>mg/L | 231.9% |
| iron<br>(Facility West) | 30<br>mg/L | 1.0<br>mg/L | 3000% |
| zinc<br>(Facility West) | 0.57<br>mg/L | 0.23<br>mg/L | 247.8% |
| copper<br>(Storm Drain Parking Lot) | 0.034<br>mg/L | 0.0332<br>mg/L | 102.4% |

185. Exceedances of the NALs evidence Global Plating's failure to identify, develop and/or implement effective site specific BMPs to reduce or prevent contaminated storm water discharges from the Facility as required to comply with the General Permit's technology-based Effluent Limitations (i.e., BAT/BCT standard).

186. Global Plating has not and does not implement basic pollution prevention techniques commonplace in the industry, which further confirms the company's failure to comply with the BAT/BCT mandate.

187. Global Plating has violated and continues to violate the General Permit's Receiving Water Limitations. Specifically, polluted storm water discharges from the Facility containing concentrations of metals exceeding applicable water quality standards, adversely affecting human health and the environment, and threatening to cause pollution and/or a public nuisance.

188. Polluted storm water discharges from the Facility containing concentrations of pollutants (see TABLE 7 below) that exceed applicable water quality standards establish violations of the General Permit's Receiving Water Limitations.

**TABLE 7**

SUMMARY OF 1/28/2021 STORM WATER SAMPLE
ANALYSIS COMPARED TO APPLICABLE WATER QUALITY STANDARDS

| Pollutant (Discharge Point) | Result | Basin Plan/CTR (Freshwater CMC) | % Exceedance | Basin Plan/CTR (Saltwater CMC) | % Exceedance |
|---|---|---|---|---|---|
| chromiumVI[1] (Shared Parking Lot) | 0.027 mg/L | 0.016 mg/L | 168.8% | 1.1 mg/L | x |
| copper (Shared Parking Lot) | 0.16 mg/L | 0.013 mg/L | 1230.1% | 0.0108 mg/L | 1481.5% |
| zinc (Shared Parking Lot) | 0.71 mg/L | 0.12 mg/L | 591.7% | 0.09 mg/L | 788.9% |
| nickel (Shared Parking Lot) | 0.11 mg/L | 0.47 mg/L | x | 0.0624 mg/L | 176.3% |
| chromiumVI (Facility West) | 0.065 | 0.016 mg/L | 406.3% | 1.1 mg/L | x |
| copper (Facility West) | 0.077 mg/L | 0.013 mg/L | 592.3% | 0.0108 mg/L | 713% |
| zinc (Facility West) | 0.57 mg/L | 0.12 mg/L | 475% | 0.09 mg/L | 633.3% |
| nickel (Shared Parking Lot) | 0.11 mg/L | 0.47 mg/L | x | 0.0624 mg/L | 176.3% |
| copper (Storm Drain Parking Lot) | 0.034 mg/L | 0.013 mg/L | 113.3% | 0.0108 mg/L | 314.8% |
| zinc (Storm Drain Parking Lot) | 0.19 mg/L | 0.12 mg/L | 158.3% | 0.09 mg/L | 211.1% |

189.   Storm water discharges containing pollutant concentrations that exceed applicable water quality standards, including those contained in the Basin Plan and CTR, are violations of the General Permit's Receiving Water Limitation prohibiting the discharge of storm water which causes or contributes to an exceedance of any applicable water quality standard. General Permit, § VI.A.

190.   The exceedance of water quality standards (see TABLE 7) demonstrates that the Facility's storm water discharges adversely affect human health and the environment, and threaten to cause pollution and/or a public nuisance.

191.   Global Plating has violated and continues to violate the General Permit's SWPPP requirements by failing to develop and/or implement a lawful SWPPP.

---

[1] The samples were analyzed for chromium (total). The Facility does not use chromiumIII, and therefore all chromium present in the Facility's storm water discharges is chromiumVI.

192.   Global Plating adopted a SWPPP for the Facility on June 9, 2015 ("2015 SWPPP").

193.   The 2015 SWPPP has not been updated since being adopted, violating the General Permit. General Permit, § X.B.1.

194.   The 2015 SWPPP does not describe, or otherwise contain, BMPs that comply with the General Permit's BAT/BCT mandate.

195.   The SWPPP does not contain a lawful Source Evaluation and Pollutant Assessment.

196.   The 2015 SWPPP's site map has not been updated since June 23, 1996.

197.   The 2015 SWPPP's site map does not contain the flow direction for any drainage area as required by the General Permit.

198.   The 2015 SWPPP's site map does not include any sampling locations.

199.   The 2015 SWPPP's site map does not include the areas of industrial activity, including but not limited to, the location of dust and particulate generating areas.

200.   The 2015 SWPPP does not contain a list of industrial materials as required by the General Permit.

201.   The 2015 SWPPP does not contain a description of all potential pollutant sources as required by the General Permit.

202.   The 2015 SWPPP does not contain an assessment of potential pollutant sources as required by the General Permit.

203.   The 2015 SWPPP does not contain the description of any advanced BMPs.

204. The 2015 SWPPP does not contain a Monitoring Implementation Plan.

205. Global Plating has violated and continues to violate the General Permit's MIP requirements by failing to develop and/or implement a MIP.

206. Global Plating has not conducted monthly visual observations since at least May 7, 2016.

207. Global Plating has not collected or analyzed any samples of storm water associated with the Facility's industrial activity since at least May 7, 2016.

208. Global Plating has violated and continues to violate the General Permit's annual Compliance Evaluation requirements.

209. Global Plating has failed to conduct any annual Compliance Evaluations between 2016 and the present.

## VII.         CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges from the Facility Without Lawful
General Permit Coverage Constitute Violations of an Effluent
Limitation and are Violations of Section 301(a) of the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

210. Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

211. Global Plating has failed, and continues to fail, to obtain proper coverage under the General Permit for the discharge of storm water associated with industrial activity at the Facility.

212. Global Plating has failed to enroll in the General Permit as a facility with NOI status, i.e., unlawful enrollment under NEC status.

213.   Global Plating is liable for ongoing, daily violations of the Act and General Permit's NEC regulations from May 7, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

214.   Each date on which Global Plating re-certified its NEC status with the State Board since enrolling in 2015 is a separate and distinct violation of the Act and General Permit.

215.   Global Plating is liable for individual violations of the Act and General Permit each it has operated and continues to operate under an invalid NEC exemption.

216.   Defendant's violations of Act and General Permit are ongoing and continuous.

217.   Global Plating is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

218.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

219.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendant as set forth hereafter.

1

2

3

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Technology-Based Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

4

5

220.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

6

7

8

9

221.    Global Plating has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that comply with the technology-based BAT/BCT pollution reduction standard.

10

11

12

13

222.    Global Plating discharges storm water from the Facility containing concentrations of pollutants exceeding what is achievable through the implementation of BAT/BCT levels of control during every significant rain event (i.e., greater than 0.1 inches).

14

15

16

17

223.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

18

19

20

21

224.    Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

22

23

225. Each and every violation of the General Permit's technology-based pollution control standard is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

226. Global Plating is liable for violations of the Act, and General Permit's technology-based Effluent Limitation on an ongoing and continuous basis from May 7, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

227. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

228. Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

229. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a).

230. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendant as set forth hereafter.

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Receiving Water Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

231.   Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

232.   Since at least May 7, 2016, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants (as detailed above at Table 7), that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's Section VI.A Receiving Water Limitation.

233.   Since at least May 7, 2016, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants, including toxic metals, that adversely impact human health and the environment in violation of the General Permit's Section VI.B Receiving Water Limitation.

234.   Since at least May 7, 2016, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants, including toxic metals, that threaten to cause pollution or a public nuisance in violation of the General Permit's Section VI.C Receiving Water Limitation.

235.   Baykeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Facility, occur each time storm water is discharged from the Facility.

236.   Global Plating is liable for violations of the Act, and General Permit's Receiving Water Limitations for each day of significant rainfall (i.e., greater than 0.1 inches) from May 7, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

237.   Defendant's violations of the General Permit's Receiving Water Limitations are ongoing and continuous.

238.   Every day, since at least May 7, 2016, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

239.   Each and every violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

240.   Global Plating is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

241.   Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

242.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a).

243.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Prepare, Implement, Review, and Update**
**A Lawful Storm Water Pollution Prevention Plan**
**(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

244.   Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

245.   Defendant has not developed and/or implemented a legally adequate SWPPP for the Facility.

246.   Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

247.   Each day since May 7, 2016 that Defendant has not developed, implemented, and reviewed and updated a legally adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

248.   Defendant has been in violation of the General Permit's SWPPP requirements every day since May 7, 2016. Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

249.   Global Plating is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

250.   Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

251.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a).

252.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendant's Failure to Prepare Annual Comprehensive Site Compliance Evaluations**
**(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

253.   Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

254.   Defendant has not conducted or prepared annual Compliance Evaluations for the Facility since at least 2016.

255.   Defendant's violations of the General Permit's Compliance Evaluation requirements are ongoing and continuous.

256. Each day since May 7, 2016 that Defendant has not conducted or prepared Compliance Evaluations for the Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

257. Defendant has been in violation of the General Permit's Compliance Evaluation requirements every day since May 7, 2016. Violations continue each day that Compliance Evaluations for the Facility are not prepared.

258. Global Plating is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

259. Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

260. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a).

261. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendants as set forth hereafter.

/ / /

/ / /

/ / /

/ / /

## SIXTH CAUSE OF ACTION

### Defendant's Failure to Develop and Implement
### a Lawful Monitoring and Reporting Program
### (Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

262.   Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

263.   Defendant has not developed and implemented a legally adequate monitoring implementation plan, or MIP, for the Facility.

264.   Defendant's violations of the General Permit's MIP mandate are ongoing and continuous.

265.   Each day since May 7, 2016 that Defendant has not developed and implemented a lawful MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

266.   Global Plating is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

267.   Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

268.   An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a).

269.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against Defendants as set forth hereafter.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated, and to be in violation of, the General Permit and Act as alleged herein;

b.   Order Defendant to obtain properly NOI coverage for the Facility;

c.   Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

d.   Order Defendant to immediately implement storm water pollution control technologies (i.e., BMPs) that meet the BAT/BCT standard, and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant to prepare a SWPPP consistent with the General Permit's requirements, and implement procedures to regularly review and update the SWPPP;

f.   Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $56,460 per day per violation pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief deemed appropriate by the Court.

DATED: July 14, 2021          Respectfully submitted,

By:   */s/ Jesse C. Swanhuyser*
       Jesse C. Swanhuyser
       Sycamore Law, Inc.
       **Attorney for Plaintiff**